**THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| APRIL JENSEN, | |
|     Plaintiff, | Case No:  3:21-cv-346 |
| vs. | **COMPLAINT AND JURY DEMAND** |
| UNIVERSITY OF NOTRE DAME DU LAC, | |
|     Defendant. | |

COMES NOW the Plaintiff April Jensen, by and through her attorneys, Newkirk Zwagerman, P.L.C. and DeLaney & DeLaney LLC, and for her cause of action states:

<u>**INTRODUCTION**</u>

1.      Plaintiff April Jensen brings this action against the Defendant, The University of Notre Dame du Lac ("UND") for damages and equitable relief, for gender discrimination, pregnancy discrimination, and retaliation in her employment in violation of her rights under federal law.

2.      Plaintiff hopes to expose the manner in which gender bias and stereotypes affect the evaluation of her behavior.  During her employment at Notre Dame, Coach Jensen was devalued because of her gender both in the assessment of her worth that affected her pay relative to similarly situated males and in the evaluation of her performance, again relatively to similarly situated males.  These differences in the evaluation of her behavior, her value and her performance were the result of gender bias or stereotypes that were later exacerbated by her pregnancy.

3.      This case involves the overlapping relationship between Title VII that prevent discrimination in any employer and the additional duties to prevent discrimination in a public or

private institution receiving federal funding (Title IX) and the manner in which Title IX has, to date, been interpreted to accommodate discrimination toward women rather than to eliminate it. Title IX and its regulations prohibit discrimination based on gender including prohibiting gender stereotypes, biases and unequal pay and benefits.  Title IX also requires heightened awareness by a University of the risks of inequality for women in athletics, particularly when the University appears out of compliance with the statute.

4.      April Jensen also brings these claims under both Title VII and Title IX to reflect that UND, while it is founded as a religious institution, also chooses to accept federal funds and in so doing, accepts the prohibition against permitting gender stereotypes or pregnancy discrimination.   If Notre Dame prefers to seek an exception to permit it to directly discriminate against women based on the outdated view that women are subservient to men or that if pregnant, need to be confined to the home or denied access to work as a professional, then Plaintiff seeks as part of her equitable relief that Notre Dame give up all access to federal funds, federal contracts or loans backed by federal money.

5.      April Jensen brings this employment discrimination action against UND ("UND") to seek redress of ND's violation of her rights under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991 ("Title VII") and the Pregnancy Discrimination Act of 1978 (the "PDA"), 42 U.S.C. 2000e *et seq*.; the Equal Pay Act (the "EPA"), 29 U.S.C. § 206; and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"), all of which prohibit gender discrimination, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*., which provides job-protected leave for certain family and medical reasons.

6.     Title VII protects employees from gender-based discrimination in the terms and conditions of their employment, including pregnancy discrimination.

7.     The Pregnancy Discrimination Act is an amendment to Title VII which added to its definitions that that "[t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions. . ." and requires employers to treat women affected by pregnancy or related conditions the same as all other workers.

8.     The EPA prohibits discrimination on the basis of sex in the payment of wages by employers.

9.     Title IX prohibits sex discrimination in education and related activities, and it applies to claims of sex discrimination in certain employment situations, including coaches, administrators, and academics. 20 U.S.C. § 161; 34 C.F.R. part 106, Subpart E.

10.     Each of these statutes are related because they are all intended to address the variety of ways in which gender bias or stereotypes about women will influence our evaluation of their behavior while not similarly influencing the evaluation of males.

### *Risks of Gender Stereotypes*

11.     Female coaches at institutions across the nation are at a high risk of gender bias adversely affecting the terms and conditions of employment.

12.     A female coach is judged differently and more harshly for engaging in the same type of behavior as males and will be judged differently by her coworkers and at times by her student athletes and even their parents.

13.     A female is expected to behave in a manner that is consistent with societal stereotypes about females. If she behaves in a stereotypically feminine manner, then she is blamed for being too soft as a coach. If she behaves the way we expect good coaches to behave, then she is blamed for being too harsh.

14.     These double standards often result in the differential evaluation of that female's behavior.

15.     Gender bias, gender stereotypes and the resulting double standards will impact women in a variety of ways.   They can first, interfere with the hiring of females into leadership roles. Second, they will impact the evaluation of the worth or amount of pay provided to females. Third, they will impact the evaluation of female behavior, including performance.  Finally, those biases can be further exacerbated or even triggered by conditions such as pregnancy.

16.      These biases or stereotypes will therefore create downward pressure on pay decisions while causing others (administration, coworkers, students) to notice mistakes more quickly or to have an exaggerated response to a perceived error.

17.     These same biases will cause others to also have a muted response to female success (good performance, exceptional work, doing more work, etc.).

18.     Finally, these biases can cause coworkers, students and others to more harshly evaluate the normal behavior of the female and result in complaints or concerns about her that have no validity, but are then used as a means to discipline the female.

19.      A university that relies, in whole or in part, upon a differential evaluation of the female or complaints about the female generated by stereotypes is a form of gender discrimination that violates Title VII and Title IX.

### Evidence of a Gendered Work Environment and Overt Gender Segregation of Women's Sports/Leadership Roles as Evidence of Stereotypes

20.     Women remain, disturbingly, segregated in college athletics.

21.     Statistics show that 75% of athletic directors are male, 97% of men's teams are coached exclusively by men, and 57.1% of women's teams are coached by men.[1]

22.     At UND, 5 of the top 7 positions within the athletics administration are held by men, including the Athletic Director position.

23.     UND has 16 segregated varsity sports teams: 8 men's teams and 8 women's teams. UND offers an additional 4 combined sports (cross country, fencing, swimming and diving, and track and field) in which men and women have separate rosters and compete separately, but the men's and women's teams are treated as one merged team for other purposes, such as coaching and administration.

24.     All 8 of  men's-only teams  are coached by men.

25.     Only 5 of the 8 women's teams are coached by women.

26.     All 4 of the combined teams are coached by men.

27.     The gender segregation in college athletics is not "separate but equal"; rather, it is one-way segregation that gives men almost exclusive access to coaching men and disproportionate access to coaching women.

28.     At UND, the role of head coach for men's teams follows the traditional path of making men the exclusive holders of those jobs, even for merged teams.  Women are permitted to coach some women's teams and are relegated only to assistant coaches of men's teams. Regardless

---

[1] Acosta, R.V. and Carpenter, L.J., *Women in Intercollegiate Sport: A Longitudinal, National Study, Thirty-Seven Year Update* (2014) *available at* www.acostacarpenter.org.

of physical differences between male and female athletes, there is no reason (other than gender stereotypes) for a university to exclusively recruit and hire men to coach men while permitting men to also hold a majority of the coaching positions on women's teams.[2]

29.    Continued, one-way segregation is strong evidence of gender stereotypes within each university and, if not addressed, it will continue to exacerbate existing gender stereotypes that harm women like Coach Jensen.[3] It is prohibited by Title IX. *See* 34 C.F.R. § 106.51(a).

***Title IX: Imbalances as Evidence of Gender Stereotypes & Interrelation with Title VII***

30.    Per its 2018 EADA report, UND is also out of compliance with Title IX.

31.    Title IX requires, among other things, equal participation opportunities for male and female students. In simple terms, this means that if exactly half of the students at a university are female, then half of the university's athletes must be female.

32.    Instead, in 2018, approximately 47.7% of UND's undergraduate students were female while only 40.8% of its athletes were female (508 male athletes and 350 female athletes). This means that would have needed to add 113 participation opportunities for women in order to be compliant with Title IX.

---

[2] "Based on our results and other findings that have examined the impact of head coaches on teams' and players' performances, it appears that both men and women are readily equipped for success in the coaching profession (and is some cases, women coaches have been more successful than the male coaches they replace. As such, our results imply that the absence of women coaches for men's teams is not grounded in any objective or reliable evidence." Darving, L., Pegoraaro, Al., & Berri, D., *Are Men Better Leaders? An Investigtion of Head Coaches' Gender and Individual Players' Perfrmance in Amateur and Professional Women's Basketball*, Sex Roles. 78:455–66 (2018) (internal citations omitted).

[3] "[A 2008 study] found not only that women have less access to positions as head coaches, but also than when women are able to obtain these positions, they are not treated with the same level of respect that their male colleagues are afforded. Processes such as these reinforce the subconscious formation of leadership stereotypes and serve to perpetuate sport as a gendered space. These stereotypes often exist despite a lack of evidence and objective measurements of coaching performance." *Id.*

33.     The purpose of Title IX was to address the long-standing negative consequences of gender stereotypes—how society traditionally expects women to behave in athletics.

34.     Title VII forbids discrimination because of sex against any individual in hiring or "with respect to [their] compensation, terms, conditions, and privileges of employment . . . ." 42 U.S.C. § 2000e-2(a)(1). Title VII also makes it an unlawful practice for an employer "to limit, segregate, or classify . . . employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise affect [their] status as an employee . . . ." 42 U.S.C. § 2000e-2(a)(2).

35.     Title IX prohibits sex discrimination in educational programs and activities receiving federal financial assistance, and also applies to a claim of sex discrimination in employment.

36.     Title IX applies to the employment of coaches, administrators, and academics and states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681.

37.     Title IX regulations specific to employees were promulgated by congress. See 34 C.F.R. part 106, Subpart E. *See also N. Haven Bd of Educ. v. bell*, 456 U.S. 512, 512 (1982) (noting that "subpart E regulations promulgated in connection with title IX are valid.").

38.     The U.S. Department of Education also adopted guidance interpreting Title IX to cover and protect employees of educational institutions. *See* Title IX Resource Guide, *available at* https://www2.ed.gov/about/offices/list/ocr/docs/dcl-title-ix-coordinators-guide-201504.pdf.

39.     Title IX's legislative history makes clear that Title IX's gender discrimination prohibition applies to the employment of coaches, administrators, and academics. See Simpson, Lynda Guild, Sex Discrimination in Employment under Title IX, U. Chi. L. Rev. Vol. 48: Issue 2, Article 8.[4] *See also* 14 C.F.R. § 1253.500(a) and 34 C.F.R. § 106.51(a) ("No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination in employment, or recruitment, consideration, or selection therefor, whether full-time or part-time, under any education program or activity operated by a recipient that receives Federal financial assistance.").

40.     Title IX regulations make clear that Title IX's gender discrimination prohibition applies to Defendant's employment decisions including, but not limited to, decisions regarding hiring, promotion, consideration for and award of tenure, demotion, rates of pay or any other form of compensation, and changes in compensation. 14 C.F.R. § 1253.500(b)(1)–(10), 34 C.F.R. § 106.51(b)(1)–(10).

41.     Courts have held that subjecting an individual to sex stereotyping constitutes sex discrimination. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989). The Supreme Court explained: In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be, for example, aggressive, has acted on the basis of gender.[5]

42.     Sex stereotyping also violates Title IX's prohibition of discrimination on the basis of sex. (U.S. Depart. of Justice – Title IX Legal Manual).

---

[4] Available at: https://chicagounbound.uchicago.edu/uclrev/vol48/iss2/8.

[5] Gender stereotyping has been fully recognized in this District: *EEOC v. A&E Tire, Inc.*, 325 F. Supp. 3d 1129, 1134 (D. Colo. 2018) (recognizing sex stereotyping and applying *Price Waterhouse*).

## THE PARTIES, JURISDICTION AND VENUE

43.     Coach Jensen is a citizen of Illinois.

44.     Defendant Notre Dame is a private non-profit university incorporated under the laws of Indiana with its principal place of business in Notre Dame, Indiana.

45.     Notre Dame receives Federal financial assistance.

46.     Coach Jensen, a female, was an "employee" of Notre Dame as defined in Title VII 42 U.S.C. § 2000e(f), and the EPA, 29 U.S.C. § 203(e).

47.     Notre Dame is an "employer" as defined in Title VII, 42 U.S.C. § 2000e(b), and the Equal Pay Act, 29 U.S.C. § 203(d).

48.     Notre Dame is an "educational institution" as defined in Title IX, 20 U.S.C. § 1681.

49.     This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331, and 42 U.S.C. § 2000e-5(f)(3), 29 U.S.C. § 206(d), 20 U.S.C. § 1681, and 29 U.S.C. § 2601 *et seq*.

50.     This Court has jurisdiction to provide declaratory and other relief pursuant to 28 U.S.C §§ 2201 and 2202.

51.     Venue is proper in the United States District Court for the Northern District of Indiana pursuant to 28 U.S.C. § 1391(b) because the events forming the basis of Plaintiff's claims occurred in Notre Dame, Indiana, which is within the jurisdiction of this Court.

52.     Plaintiff has exhausted her administrative remedies by timely filing a Charge of Discrimination with the EEOC (Charge No. 470-2021-00393) and receiving a Notice of Right to Sue. This action is being bought within 90 days from the issuance of the Right to Sue, issued on or about February 25, 2021.

9

## STATEMENT OF FACTS

53.     Coach Jensen is the former associate head coach of Men's and Women's Swimming at University of Notre Dame (Notre Dame).

54.     Notre Dame terminated her employment on May 13, 2020.

55.     Coach Jensen announced her pregnancy to her supervisor, head coach Mike Litzinger (male), in May of 2019.

56.     In the Fall of 2019, Coach Jensen returned to coach as a visibly pregnant woman.

57.     Coach Jensen informed Coach Litzinger of her post-partum plans to only take a few weeks of maternity leave so she could return to work in time to attend the team's two-week training trip to Florida at the end of December 2019.

58.     Coach Litzinger disagreed with her plan and was openly patronizing and judgmental.

59.     The University of Notre Dame offers 12 weeks of maternity leave.

60.     During January to March 2020, when the team prepares for championship season, Coach Litzinger made Coach Jensen's work environment intolerable by icing her out and continuing to make judgmental comments about her maternity plans.

61.     Coach Jensen was held to a double standard with swimmer performances and was given contradictory guidance on how to coach the team.

62.     On November 1st, 2019, the team attended a meet where Coach Jensen was in the end of her third trimester.

63.     Coach Litzinger ignored her at the meet.

64.     After the meet, Coach Litzinger criticized the performance of Coach Jensen's sprinters.

65.     Coach Jensen's athletes performed comparably to their mid-season speeds and her coaching plans had been previously approved by Coach Litzinger at the beginning of the 2019 season.

66.     In the following meet, Coach Jensen's sprinters swam faster or standard for that time of year.

67.     Coach Jensen did not receive positive feedback for these results, rather Coach Litzinger continued to avoid her and criticize her work.

68.     The additional criticism and targeted anger caused Coach Jensen high levels of anxiety and Coach Litzinger acknowledged he had not made her pregnancy easy.

69.     Following the Ohio State Invitational, Coach Litzinger made the decision to "take over" the practice planning and writing for sprinters.

70.     Coach Jensen asked if he was taking away her responsibilities and why he no longer trusted her to run practices.

71.     At this time, Coach Jensen was very visibly pregnant and planned to induce her daughter so that she could have four weeks of maternity leave before training camp which took place December 29, 2019 through January 12, 2020.

72.     Coach Litzinger was not supportive of her plan.

73.     Coach Litzinger told Coach Jensen he could handle the trip without her.

74.     Coach Jensen took the week of December 2–7, 2019, off per her physician's recommendation in preparation for the early induction.

75.   Coach Jensen delivered a healthy baby girl on December 8th, 2019.

76.   Coach Jensen did not attend the two-week training trip in Florida.

77.   Coach Litzinger provided Coach Jensen with occasional updates during her five weeks of maternity leave.

78.   Coach Jensen returned to work January 13, 2020.

79.   When she returned, Coach Jensen approached Coach Litzinger to clarify her role as Associate Head Coach.

80.   Coach Litzinger told her nothing has changed, despite earlier in the season telling her he would be taking over the sprinters.

81.   Coach Litzinger then told Coach Jensen she would need to obtain a return-to-work form before she could get back to work, bringing this to her attention for the first time since she announced her pregnancy.

82.   Coach Jensen obtained and turned in her return-to-work form on January 16, 2020.

83.   That day, Coach Litzinger directed Coach Jensen to work with the Mid Distance Stroke Group, not the Sprinters.

84.   With this assignment, Coach Jensen found herself assisting the volunteer coach who was leading the Mid Distance group practice.

85.   This change felt like a demotion.

86.   Coach Jensen was also stripped of her job duties in front of all other coaching staff and all male and female student athletes.

87.   The other coaching staff and student athletes are very well aware of the hierarchy and status Associate Head Coaches are supposed to have on a Division I team.

12

88.     Despite being told she was still the sprinters' coach, the entire team and Coach Jensen observed Assistant Coach Brinkman (male) run the sprinter's practice using Coach Litzinger's workouts.

89.     When Coach Jensen was permitted to coach the sprinters, Coach Litzinger would finish running his practice with the mid-distance group and then take the sprinter workout from Coach Jensen, running the rest of the practice while she assisted him.

90.     The sprinter group was not given an explanation for the abrupt change.

91.     Coach Jensen had asked Coach Litzinger to explain her need to take FMLA leave to the group prior to her absence, but he did not.

92.     Coach Litzinger's actions upending the coaching hierarchy sent the message that Coach Jensen had done something wrong and that she was no longer capable of leading practice for her sprinters.

93.     The Shamrock Invitational, January 24–25, 2020, was Coach Jensen's first meet following her maternity leave.

94.     Coach Litzinger continued his pre-maternity leave treatment of Coach Jensen, ignoring her during the meet.

95.     As a result, the student athletes no longer went to Coach Jensen for coaching and instruction, but instead went to other coaches before and after their sprint events.

96.     On January 26, 2020 Coach Jenson got mastitis and informed her supervisor that she needed to take antibiotics to clear it up.

97.     In response, on January 27, 2020 Coach Litzinger reminded Coach Jensen of ACC planning and asked her if she still wanted to participate.

98.     Coach Jensen had previously discussed ACC rosters with Coach Litzinger, providing input.

99.     On January 27, 2020, she informed him that she had a fever, was in pain, and would not be able to work.

100.    Coach Litzinger responded by asking Coach Jensen to take over his January 28, 2020 practice so he could recruit.

101.    Coach Jensen found this request unusual as she had just informed Coach Litzinger of her mastitis and fever.

102.    In the previous 5 years working together, Coach Litzinger had never made a similar request.

103.    Coach Jensen, wanting to be a team player, told Coach Litzinger she would let him know the morning of January 28, 2020 if she could make it.

104.    Coach Litzinger did not acknowledge her effort to help when she was ill and instead response that he hoped she would recognize that championships were coming up and he could use the help.

105.    On January 29, 2020, Coach Litzinger asked for a meeting.

106.    Coach Jensen arrived and found Coach Litzinger and Assistant Athletics Director Juli Schreiber in attendance.

107.    During the meeting, Coach Litzinger told Coach Jensen he wanted to touch base with her following her return to work.

108.    Coach Jensen responded with concerns that she felt unsupported by him during and after her pregnancy.

14

109.     Coach Jensen provided examples including the removal of responsibilities and how Coach Litzinger had done this in a confusing, humiliating way.

110.     Coach Litzinger commented that Coach Jensen had only shown up for 4 days of practice and that she disappeared during meets.

111.     The statements Coach Litzinger made were not true.

112.     This was the first time Coach Jensen was made aware of his concerns.

113.     Assistant AD Schreiber commented that Coach Litzinger had supported Coach Jensen by paying her full-time for working a "modified schedule."

114.     Coach Jensen explained her absences and multiple trips to the bathroom during the Shamrock Invitational were to pump breastmilk.

115.     Coach Jensen did not work a modified schedule; she simply returned to work following maternity leave and took breaks as necessary to pump breastmilk.

116.     Following maternity leave, Coach Jensen had well-child exams, and received treatment for mastitis, postpartum depression and anxiety.

117.     Coach Jensen was not disappearing during the January Shamrock Invitational, she was making an effort to pump breastmilk for her daughter.

118.     Coach Jensen took FMLA leave beginning January 30, 2020, in order to receive treatment for pregnancy-related medical conditions.

119.     Her leave was later extended during the implementation of the pandemic quarantine.

120.     Prior to the expiration of her FMLA leave, Coach Jensen met with Coach Litzinger to talk about her role moving forward.

121.    Coach Litzinger informed Coach Jensen that he was going to have to make some changes to the program but did not given any indication that she would not be a part of those changes.

122.    Coach Jensen specifically asked if she was going to have her job responsibilities back given the prior decision to remove her from associate coaching duties.

123.    Coach Litzinger told her she would not be demoted because he could not run the program without her.

124.    After learning Coach Jensen wanted to meet with her athletes individually before meeting as a group, Coach Litzinger told her she was not allowed to have one on one communications with her athletes.

125.    He stated that "nobody cares what you went through" regarding her post-partum health concerns and absences from the team.

126.    Coach Litzinger then asked Coach Jensen's assistant Coach Brinkman (male) to lead videoconference meetings with her athletes and recap the meetings in the following staff meeting instead of Coach Jensen.

127.    Coach Jensen met with Associate Director, Operational Effectiveness Juile Boser on February 28, 2020 and reported discriminatory treatment during and after her pregnancy.

128.    Coach Jensen made the same complaint on March 10, 2020 during a meeting with Lori Mauer, Associate Director, HR Consulting.

129.    Instead of receiving guidance or follow up from human resources or administration, on May 13, 2020 Coach Jensen was notified of a Zoom meeting with Coach Litzinger and Assistant AD Schreiber.

130.   The meeting began with Coach Litzinger telling Coach Jensen that she had been amazing for the program and had been good and professional.

131.   Coach Litzinger continued by saying that based on discussions with the Athletic Director Jack Swarbrick, he had been empowered to not renew her contract.

132.   He made a point of claiming the termination was based on the last three years and not the last six months and that it had nothing to do with her coaching or her relationship with athletes.

133.   Despite the fact that her termination was allegedly three years in the making, Coach Jensen had received no write ups or performance improvement plans regarding the alleged relationships outside of the team she failed to establish.

134.   The only miscommunications Coach Jensen can recall were based on her direct communication style—a style similar to Coach Litzinger's.

135.   Furthermore, throughout her tenure at ND, Coach Jensen was paid less than a similarly situated male colleague.

136.   Coach Jensen started her employment ND in 2015 as an Assistant Coach.

137.   Coach Aaron Bell was hired as an Associate Head Coach in 2016.

138.   While their job titles were different, Coach Bell and Coach Jensen were performing the same job duties.

139.   As such, Coach Jensen asked Coach Litzinger to be promoted to Associate Head Coach and provided with a corresponding raise so that her pay would be comparable to Coach Bell's.

140.    Coach Litzinger promoted Coach Jensen to Associate Head coach and provided her with a raise for the 2017–2018 academic year.

141.    The remaining difference in pay between Coach Jensen and Coach Bell was purportedly due to Coach Bell's experience level.

142.    Despite the promotion, Coach Jensen discovered that she was still being paid significantly less than Coach Bell.

143.    For instance, in the 2017–2018 academic year, Coach Jensen and Coach Bell had the same job title, and nearly identical job duties. The differences in their experience level did not justify the pay differential.

144.    During the 2017–2018 academic year, Coach Bell was paid $77,250, while Coach Jensen was paid only $56,925—$20,325 less than Coach Bell.

145.    As Associate Head Coaches, both Coach Jensen and Coach Bell had one assistant coach working under them, both worked the same number of hours, both were responsible for recruiting (Coach Jensen recruited for the women's team, while Coach Bell recruited for the men's team), both were responsible for coaching approximately the same number of athletes (Coach Jensen coached the sprint group, while Coach Bell coached the distance group), and both had similar administrative duties and responsibilities.

146.    By the end of the 2017–2018 season, Coach Jensen had been coaching for 9 years; she has only coached at the Division I level.

147.    Coach Bell had been coaching for 14 years; he also has only coached at the Division I level.

148.     During the 2017–2018 and 2018–2019 seasons, Coach Jensen proved herself to be a highly successful coach.

149.     In the summer before the 2019–2020 season, Coach Jensen cited her proven success and again asked for a raise so that her compensation would be comparable to Coach Bell's.

150.     Coach Litzinger seemed to agree told her that he would look into it.

151.     Instead, Coach Jensen was fired at the end of the 2019–2020 season.

### COUNT I
### Gender and Pregnancy Discrimination, in violation of Title VII

152.     Plaintiff re-alleges all preceding paragraphs as if fully set forth herein.

153.     Under the provisions of Title VII, it is unlawful for an employer to discriminate against an employee on the basis of sex, including because of pregnancy and related medical conditions.

154.     As part of the prohibition against sex discrimination, it is unlawful for an employer to alter working conditions based on gender or gender stereotyping.

155.     Notre Dame knowingly and intentionally discriminated against Coach Jensen by treating her less favorably than similarly situated employees in the terms and conditions of her employment because of her sex, pregnancy, childbirth, and/or related medical conditions.

156.     Notre Dame knowingly and intentionally discriminated against Coach Jensen by terminating her employment because of her sex, pregnancy, childbirth, and/or related medical conditions.

157.     Defendant's conduct was discriminatory against  plaintiff with respect to failing to treat her equally to male coaches, allowing her to be discriminated against by her supervisors, subjecting her to different and heightened scrutiny at work, holding her to different and higher

standards, taking away her job duties and reassigning them to male coaches, and paying her less than similarly situated male coaches, in violation of Title VII.

158.    Defendant discriminated against Plaintiff on the basis of gender in violation of Title VII by holding her to a different standard than similarly situated men in the terms and conditions of her employment, including but not limited to:

>   her evaluations,
>
>   her  pay, and
>
>   in other aspects of her work all of which impacted or altered her working conditions relative to males.

159.    Defendant also discriminated against plaintiff based on her pregnancy and based on post-pregnancy conditions (all related to her gender as well) including breast feeding, her need for time to care for her child and based on the change in work duties that were directly responsive to her pregnancy leave and need to breast feed her child.

160.    On information and belief, in so violating Title VII, Defendant acted with malice or in reckless disregard of Plaintiff's rights under Title VII.

161.    As a result of Defendant's conduct, Plaintiff suffered loss of employment, loss of wages and benefits, emotional pain and suffering, humiliation, embarrassment, inconvenience, damage to her reputation, loss of career, and out of pocket expenses.

162.    The actions of Defendant also require the imposition of specific equitable and injunctive relief necessary to ensure future compliance with Title VII including, but not limited to:

(a)    A court order requiring that the Defendant implement training in all coaching

positions to avoid gender bias and stereotyping.

(b)     A court order requiring that Defendant evaluate both standards of coaching, work rules and processes to ensure that they do not impact women less favorably than males; and

(c)     Such other and further relief as may be required to effectuate any verdict or to ensure compliance with Title VII.

**WHEREFORE**, Plaintiff requests lost wages and benefits; compensatory damages for loss of employment, loss of wages and benefits, emotional pain and suffering, humiliation, embarrassment, inconvenient and damage to her reputation, and out-of- pocket expenses; punitive damages, any other relief the Court deems just and necessary to make Plaintiff whole and effectuate the purpose of Title VII; prejudgment and post-judgment interest as allowed by law; attorneys' fees; expert witness fees; and costs.

### COUNT II
### Retaliation in Violation of Title VII

163.    Plaintiff re-alleges all preceding paragraphs as if fully set forth herein.

164.    Plaintiff engaged in protected activity under Title VII when she reported discriminatory treatment during and after her pregnancy.

165.    Notre Dame terminated Coach Jensen's employment because she reported discriminatory treatment.

166.    As a result of Defendant's conduct, Plaintiff suffered loss of employment, loss of wages and benefits, emotional pain and suffering, humiliation, embarrassment, inconvenience, damage to her reputation, loss of career, and out of pocket expenses.

**WHEREFORE**, Plaintiff requests lost wages and benefits; compensatory damages for loss of employment, loss of wages and benefits, emotional pain and suffering, humiliation, embarrassment, inconvenient and damage to her reputation, and out-of- pocket expenses; punitive damages, any other relief the Court deems just and necessary to make Plaintiff whole and effectuate the purpose of Title VII; prejudgment and post-judgment interest as allowed by law; attorneys' fees; expert witness fees; and costs.

## COUNT III
### Gender Discrimination and Unequal Pay in Violation of Title IX

167.    Plaintiff re-alleges all preceding paragraphs as if fully set forth herein.

168.    Defendant's educational programs and activities receive Federal financial assistance within the meaning of Title IX.

169.    Title IX is a statute that prevents gender discrimination in all aspects of an employer who receives federal funds and also specifically covers  the need to achieve equality for women in college athletic departments.

170.    Title IX regulations require Defendant to take such remedial action as is necessary to overcome the effects of sex discrimination in violation of Title IX.

171.    Plaintiff was denied the benefits of and/or subjected to discrimination in the Defendant's educational programs and activities on the basis of her gender.

172.    Plaintiff's denial of benefits and subjection to discrimination was based on her sex and/or the sex of the players she coached.

173.    Gender impacted her working conditions based on stereotypes about women in leadership roles, gender biases about women generally or as objects, and/or bias based on

pregnancy to those stereotypes overlap with gender. This can include stereotypes about women being mothers first and having careers second, or that mothers or women who breast feed being inconsistent with the skills required of an assistant or head coach of athletes.

174.    As a proximate result of Defendant's actions, Plaintiff has in the past and will in the future suffer injuries and damages as set forth above.

175.    Defendant acted with deliberate indifference and willful and wanton disregard to Plaintiff's federally protected rights.

176.    As a result of Defendant's actions, Plaintiff seeks monetary damages including but not limited to economic and career loss and damages for the indignity and humiliation of being discriminated against

177.    The actions of Defendant also require the imposition of specific equitable and injunctive relief necessary to enforce the mandates of Title IX including, but not limited to:

    (a)    a court order requiring that the Defendant be audited regarding its compliance with Title IX to the extent that compliance reflects the presence of gender bias or the continued risk to females of unequal treatment based on gender, and that any failures or violations of Title IX that reflect gender discrimination be immediately remedied by the university; and

    (b)    such other and further relief to remedy violations of the law and to make Coach Jensen and other females similarly situated whole.

**WHEREFORE**, Plaintiff requests judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages; lost wages and benefits; compensatory damages for loss of employment, loss of wages and benefits, emotional pain and

suffering, indignity, humiliation, embarrassment, inconvenient and damage to her reputation, loss of career, and out-of-pocket expenses; punitive damages, any other relief the Court deems just and necessary to make Plaintiff whole and effectuate the purpose of Title VII and Title IX; prejudgment and post-judgment interest as allowed by law; attorneys' fees; expert witness fees; and costs.

## COUNT IV
### Retaliation in Violation of Title IX

178.     Plaintiff re-alleges all preceding paragraphs as if fully set forth herein.

179.     After Plaintiff complained about the gender inequities, she was retaliated against by receiving negative performance evaluations, being subjected to unequal performance metrics based on her gender, and being discharged in violation of Title IX among other things.

180.     Defendant violated Plaintiff's rights under Title IX by retaliating against her or permitting her supervisors to retaliate against her based on her complaints about pay inequity.

181.     As a proximate result of Defendant's actions, Plaintiff has in the past and will in the future suffer injuries and damages as set forth above.

182.     Defendant acted with deliberate indifference and willful and wanton disregard to Plaintiff's federally protected rights.

183.     As a result of Defendant's actions, Plaintiff seeks monetary damages including but not limited to economic and career loss and damages for the indignity and humiliation of being discriminated against.

**WHEREFORE**, Plaintiff requests judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages; lost wages and benefits; compensatory damages for loss of employment, loss of wages and benefits, emotional pain and

suffering, indignity, humiliation, embarrassment, inconvenient and damage to her reputation, loss of career, and out-of-pocket expenses; punitive damages, any other relief the Court deems just and necessary to make Plaintiff whole and effectuate the purpose of Title VII and Title IX; prejudgment and post-judgment interest as allowed by law; attorneys' fees; expert witness fees; and costs.

**COUNT V**
**Equal Pay Discrimination – EPA**

184.    Plaintiff re-alleges all preceding paragraphs as if fully set forth herein.

185.    Under the provisions of The Equal Pay Act, it is unlawful for an employer to discriminate against an employee on the basis of sex in providing equal pay for equal work.

186.    Defendant failed to pay Plaintiff as much as her similarly situated male colleagues for performing equal work requiring similar skill, effort, and responsibilities performed under similar working conditions.

187.    In addition, Plaintiff was required to do more work or more challenging work to justify her pay relative to her similarly situated male colleagues.

188.    Notre Dame willfully violated the Equal Pay Act by continuing to pay Coach Jensen less than her male colleagues, and by continuing to require Coach Jensen to do more work or more challenging work than her male colleagues, even after Coach Jensen informed Notre Dame of the gender-based disparity.

189.    While the data on pay for female coaches is not available, there is public data available showing how UND undervalues females in Academic roles.  At every level of professor (Full, Associate, Assistant), women are paid less than men for doing the same work between $1,000 a year and up to $30,000 a year.  The sources of pay inequity are largely the result of gender bias

25

or stereotypes about women and men and there is little reason to believe that these same gender stereotypes would not affect female coaches in the athletic department.[6]

190.    As a result of Notre Dame's violations of the Equal Pay Act, Plaintiff has suffered, and continues to suffer, damages in lost wages, compensation, and benefits.

**WHEREFORE**, Plaintiff requests judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages; lost wages and benefits; compensatory damages for loss of employment, loss of wages and benefits, emotional pain and suffering, indignity, humiliation, embarrassment, inconvenient and damage to her reputation, loss of career, and out-of-pocket expenses; punitive damages, any other relief the Court deems just and necessary to make Plaintiff whole and effectuate the purpose of the law; prejudgment and post-judgment interest as allowed by law; attorneys' fees; expert witness fees; and costs.

<div align="center">

**COUNT VI**
**<u>Retaliation in Violation of the FMLA</u>**

</div>

191.    Plaintiff re-alleges all preceding paragraphs as if fully set forth herein.

192.    Coach Jensen engaged in protected activity under the FMLA by applying for and obtaining medical leave under the FMLA.

193.    Notre Dame was aware of Coach Jensen's exercise of her FMLA rights.

194.    After Coach Jensen's FMLA leave, Notre Dame interfered with, restrained, or otherwise discriminated against Coach Jensen by, including but not limited to, disciplining her for absences that were approved and/or excused as part of her FMLA leave.

---

[6]    Available   at   https://www.insidehighered.com/aaup-compensation-survey/school-detail/university-notre-dame (retrieved May 12, 2021).

195.     After Coach Jensen's FMLA leave, Notre Dame interfered with, restrained, or otherwise discriminated against Coach Jensen by, including but not limited to, terminating her employment because she exercised FMLA rights by taking qualifying leave.

196.     The interference also included, but was not limited to, removing some of Coach Jensen's duties after she returned from qualifying maternity leave, and using Coach Jensen's FMLA-qualifying leave as a negative factor in employment decisions by holding her absences against her.

197.     Notre Dame's unlawful actions were intentional, willful, and done in reckless disregard of Coach Jensen's statutorily protected rights, as shown by the comment that "nobody cares what you went through" in response to her informing her employer of her post-partum depression and then citing to "performance issues" from long prior to her leave that were not raised until after she took that leave.

198.     Defendant's actions as set forth above resulted in Plaintiff's loss of advancement opportunities, employment benefits and additional compensation.

199.     By reason of the foregoing, Plaintiff has suffered damages in an amount to be determined at trial, including but not limited to back and front pay, lost sick and vacation time, lost benefits including retirement contributions, health benefits, lost pay for failure to promote, lost opportunities for advancement, compensatory damages for emotional and psychological injuries and humiliation and reasonable costs and attorney's fees.

**WHEREFORE**, Plaintiff requests judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages; lost wages and benefits; compensatory damages for loss of employment, loss of wages and benefits, emotional pain and

suffering, indignity, humiliation, embarrassment, inconvenient and damage to her reputation, loss

of career, and out-of-pocket expenses; punitive damages, any other relief the Court deems just and

necessary to make Plaintiff whole and effectuate the purpose of the law, including equitable and

injunctive relief, prejudgment and post-judgment interest as allowed by law; attorneys' fees; expert

witness fees; and costs.

<div style="margin-left: 40%;">

DELANEY & DELANEY LLC

/s/ *Kathleen A. DeLaney*
Kathleen A. DeLaney (#18604-49)
Annavieve C. Conklin (#33875-32)
3646 Washington Blvd
Indianapolis, IN 46205
Telephone: 317-920-0400
Fax: 317-920-0404
kdelaney@delaneylaw.net
aconklin@delaneylaw.net

NEWKIRK ZWAGERMAN, P.L.C.

Thomas Newkirk (*pro hac* forthcoming)
Thomas Bullock (*pro hac* forthcoming)
Danya Keller (*pro hac* forthcoming)
521 E. Locust Street, Suite 300
Des Moines, IA  50309
Telephone:  515-883-2000
Fax:  515-883-2004
tnewkirk@newkirklaw.com
tbullock@newkirklaw.com
dkeller@newkirklaw.com

</div>

## JURY DEMAND

**COMES NOW** the Plaintiff, April Jensen, and hereby requests a trial by jury in the above-captioned matter.

DeLaney & DeLaney LLC

/s/ *Kathleen A. DeLaney*
Kathleen A. DeLaney (#18604-49)
Annavieve C. Conklin (#33875-32)
3646 Washington Blvd
Indianapolis, IN 46205
Telephone: 317-920-0400
Fax: 317-920-0404
kdelaney@delaneylaw.net
aconklin@delaneylaw.net

NEWKIRK ZWAGERMAN, P.L.C.

Thomas Newkirk (*pro hac* forthcoming)
Thomas Bullock (*pro hac* forthcoming)
Danya Keller (*pro hac* forthcoming)
521 E. Locust Street, Suite 300
Des Moines, IA  50309
Telephone:  515-883-2000
Fax:  515-883-2004
tnewkirk@newkirklaw.com
tbullock@newkirklaw.com
dkeller@newkirklaw.com


**ATTORNEYS FOR PLAINTIFF**